# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

McMillan Pazdan Smith, LLC, Respondent,

v.

Donza H. Mattison, Appellant.

Appellate Case No. 2021-000365

Appeal From Greenville County
R. Lawton McIntosh, Circuit Court Judge

Opinion No. 6080
Heard December 6, 2023 – Filed August 7, 2024

## REVERSED AND REMANDED

David Eliot Rothstein, of Rothstein Law Firm, P.A., of
Greenville, for Appellant.

Thomas H. Keim, Jr., of Ford & Harrison, LLP, of
Spartanburg; Allen Mattison Bogan, of Nelson Mullins
Riley & Scarborough, LLP, of Columbia; and Miles
Edward Coleman and Samuel W. Outten, both of Nelson
Mullins Riley & Scarborough, LLP, of Greenville, all for
Respondent.

**VINSON, J.:** In this declaratory judgment action, Donza H. Mattison appeals the
circuit court's order granting summary judgment in favor of McMillan Pazdan
Smith, LLC (MPS). On appeal, Mattison argues the circuit court erred by (1)
refusing to stay proceedings in the declaratory judgment action pending the appeal
of her derivative action, (2) disregarding the key sentence in her severance

agreement regarding the valuation of her membership units, (3) refusing to allow her to conduct critical discovery, (4) allowing MPS to apply a discount to the value of her membership units for lack of control and marketability, and (5) failing to award her prejudgment interest. We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

MPS is an architectural firm with offices in South Carolina, North Carolina, and Georgia. Mattison is a former employee and current minority shareholder of MPS who worked as an architect in its Spartanburg office. Mattison began working for MPS's predecessor in September 1994 and became a partner at the firm two years later. McMillan Smith & Partners merged with Pazdan-Smith Group in 2009 to form MPS.

Following the merger, MPS members signed an operating agreement dated September 25, 2009. The 2009 Operating Agreement stated any amendment to the agreement that affected the financial or voting rights of the members required approval of all MPS members.

On September 30, 2015, Mattison refused to consent to or sign an amended and restated operating agreement (the 2015 Operating Agreement) adopted by other members of MPS. Mattison refused to sign the 2015 Operating Agreement primarily because it reduced the "required interests of members," the supermajority of the firm's membership needed to approve certain company matters, from 75% to 66.67%. The 2015 Operating Agreement stated the price of any membership interest of a properly dissociating member should be "fair market value." It defined "fair market value" as it relates to member's units as "the value of the [u]nits as determined by the [m]anagement [c]ommittee in accordance with the procedure set forth in Section 5.1(s) of [the 2015 Operating Agreement]." Section 5.1(s) of the 2015 Operating Agreement stated the management committee has the power and authority to "determine the per unit price of any Membership Interest or Units . . . at least annually." Section 5.1(s) provided that the initial price per unit for 2015 was shown on Schedule B, and "all changes to said price shall be noted from time to time on the same Schedule B." The definition of "fair market value" contained in the 2015 Operating Agreement stated that if the management committee failed to determine the value of the units for two consecutive years, the seller and the management committee should first attempt to agree to a value; then, if they are unable to reach an agreement after thirty days, the value of the units should be determined by a qualified appraiser chosen by the management committee. The 2015 Operating Agreement stated "[t]he seller and [MPS] shall each pay half the fees and expenses of the [q]ualified [a]ppraiser."

Beginning on November 20, 2017, Mattison went on medical leave from MPS. On December 5, 2017, Mattison and MPS entered into a severance agreement, which addressed Mattison's dissociation from MPS. Section 2(j) of the severance agreement stated,

> The parties agree that [Mattison's] dissociation from [MPS] shall be treated as a Proper Dissociation with no penalty or reduction on the value of her financial rights. The parties agree that the value of [Mattison's] membership units shall be mutually determined in early 2018 following the close of YR2017, with [MPS] providing access to all current and prior year financial reports, tax returns, and other financial information as requested by [Mattison's] Counsel. The Proper Dissociation will be handled separately from this Agreement and will be done in accordance with the September 30, 2015 Operating Agreement.

The severance agreement further provided that these terms would not have any effect on Mattison's rights and remedies relating to her dissociation from MPS or her ownership rights or interests upon dissociation. The severance agreement stated Mattison was not "waiving any rights or claims relating to her financial interests as a member or owner of" MPS.

In January 2018, Mattison was diagnosed with breast cancer. She voluntarily resigned from MPS on February 12, 2018. On August 3, 2018, Mattison notified MPS her cancer treatments had finished and she was prepared to continue finalizing the terms of the buy-out of her membership interests. The same day, MPS conveyed an offer to purchase Mattison's 2,035.34 membership units for $267,647.21, a price based on a valuation prepared by HDH Advisors LLC (HDH), a third-party appraiser MPS had retained to provide an annual business appraisal of the firm.[1] On December 3, 2018, Mattison and MPS entered an agreement to postpone filing any action until February 1, 2019, while they continued to negotiate the value of Mattison's membership units. On January 14, 2019, Mattison sent a letter to MPS disputing HDH's valuation and demanding a higher

---

[1] HDH's fair market value of one membership unit of MPS was $182.63 before the application of a 10% discount for lack of control and a 20% discount for lack of marketability, which when applied consecutively led to an effective discount of 28%, lowering the fair market value to $131.50 per-unit.

per-unit price. Mattison demanded payment of $829,000 for her ownership interest in MPS and stated she intended to file an action for judicial valuation of her membership units and a shareholder derivative action if the matter was not resolved before February 1, 2019. On January 22, 2019, Mattison and MPS extended their agreement to postpone the filing of an action by thirty days, until March 4, 2019.

On February 20, 2019, the parties engaged in mediation in an effort to resolve the dispute but were unable to reach an agreement. MPS filed this declaratory judgment action against Mattison on February 22, 2019. The complaint requested that the circuit court find that the severance agreement was a valid and enforceable contract and that Mattison's units were to be valued in accordance with the terms of the 2015 Operating Agreement. The complaint also requested the circuit court find that MPS followed the 2015 Operating Agreement's provisions regarding the annual valuation of the company, the value of Mattison's units should be determined by applying the per-unit price from HDH's 2017 valuation, and Mattison had no right to contest HDH's 2017 valuation.

Mattison filed an answer, counterclaims, and a third-party complaint. She included counterclaims for breach of contract, judicial determination of the fair value of her distributional interest in MPS, an accounting and an order compelling production of MPS's financial records, and declaratory judgment. Her counterclaim requesting a judicial determination of the value of her membership units included a request for prejudgment interest from the effective date of her proper dissociation at the statutory rate of 8.75%.

Mattison also brought a derivative action against MPS's majority members at that time. In that action, the circuit court granted summary judgment in favor of MPS, finding Mattison could not fairly and adequately represent the other members of MPS. During the hearing on Mattison's subsequent motion to reconsider, the circuit court inquired whether MPS's declaratory judgment action should be stayed during Mattison's appeal of its ruling in the derivative action. Mattison filed a motion to stay this action pending the outcome of her appeal of the derivative action. MPS argued a stay was not warranted because the issue of whether she could be a proper representative in the derivative action did not affect the question of the valuation of her membership units.

MPS moved for summary judgment as to its declaratory judgment action. It argued Section 2(j) of Mattison's severance agreement stated proper dissociation, which included the sale of her membership units, would be handled in accordance with the 2015 Operating Agreement. It requested the circuit court find the

severance agreement was a valid and enforceable contract that prescribed the method for valuing Mattison's membership units. Mattison opposed the motion for summary judgment, arguing she did not have sufficient time to conduct discovery and that the severance agreement did not allow MPS to "unilaterally rush out and hire a third-party firm to perform the valuation." She also contended MPS did not comply with the requirements of the 2015 Operating Agreement because the changes in the price of the units was not updated on Schedule B. Mattison also filed a motion to compel, requesting the late 2019 valuation of MPS, which was performed by AEC Advisors, LLC (AEC).

The circuit court held a hearing on MPS's motion for summary judgment, Mattison's motion to stay, and Mattison's motion to compel. The circuit court denied Mattison's motion to stay, granted MPS's motion for summary judgment, and denied Mattison's motion to compel production of the 2019 appraisal but granted her motion to compel inspection of MPS's Spartanburg office. In addition, the circuit court stated Mattison was entitled to AEC's appraisal as a member of MPS despite denying her motion to compel its production.

In its order granting MPS's motion for summary judgment, the circuit court found Mattison's severance agreement was a valid and enforceable contract, which the parties signed after several weeks of negotiation while being represented by counsel. It found the severance agreement did not provide that the value of Mattison's membership units should be determined by judicial valuation. It also held that MPS followed the 2015 Operating Agreement's provisions in determining the fair market value of Mattison's membership units by hiring "HDH as a qualified third-party appraiser to determine the value of the firm." Therefore, it found that the value of Mattison's membership units should be determined by applying the per-unit price of HDH's 2017 valuation. The order also granted summary judgment in favor of MPS on Mattison's counterclaims for breach of contract, judicial determination of the value of her equity, accounting or production of records, and declaratory judgment.

Mattison filed a motion to reconsider the grant of summary judgment. She did not seek reconsideration of the order denying her motion to stay or the order partially denying her motion to compel. The circuit court held a hearing on Mattison's motion for reconsideration and denied the motion. This appeal followed.

**ISSUES ON APPEAL**

1. Did the circuit court err in refusing to stay proceedings in MPS's declaratory judgment action pending the appeal of Mattison's derivative action claims?

2.  Did the circuit court err in disregarding the key sentence in Mattison's severance agreement regarding the valuation of her ownership units, which clearly contemplated a two-step process: (1) full disclosure of all financial information about the company as requested by Mattison, followed by (2) a good-faith effort to mutually determine the value of Mattison's units, neither of which MPS complied with?

3.  Did the circuit court err in refusing to allow Mattison to conduct critical discovery before considering MPS' motion for summary judgment?

4.  Did the circuit court err in allowing MPS to apply a discount in the value of Mattison's membership units for lack of control and marketability?

5.  Did the circuit court err in failing to award prejudgment interest to Mattison?

**STANDARD OF REVIEW**

"When reviewing the grant of a summary judgment motion, [an appellate] court applies the same standard that governs the trial court under Rule 56(c), SCRCP; summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *S. Glass & Plastics Co. v. Kemper*, 399 S.C. 483, 490, 732 S.E.2d 205, 208-09 (Ct. App. 2012).  "Once the moving party carries its initial burden, the opposing party must come forward with specific facts that show there is a genuine issue of fact remaining for trial." *Id.* at 490, 732 S.E.2d at 209 (quoting *Sides v. Greenville Hosp. Sys.*, 362 S.C. 250, 255, 607 S.E.2d 362, 364 (Ct. App. 2004)).  "In determining whether a genuine issue of fact exists, the evidence and all reasonable inferences drawn from it must be viewed in the light most favorable to the nonmoving party." *Id.*

**ARGUMENTS**

**I.      Severance Agreement Valuation**

Mattison argues the circuit court erred in finding the language of the severance agreement required her to accept HDH's valuation of MPS.  She contends the severance agreement provides the value of the membership units would be mutually determined through "good-faith negotiations" after MPS provided access to financial information requested by Mattison, arguably a condition precedent to proper dissociation under the severance agreement.  Mattison asserts the severance agreement did not give MPS the right to unilaterally hire a third-party firm to perform the valuation.  She maintains the valuation of her membership units is not

controlled by the 2015 Operating Agreement, which governs only the procedural aspects of "proper dissociation." Mattison maintains the 2015 Operating Agreement only allowed the management committee to select its own appraiser if no determination of the value of the units was made for two consecutive years and no agreement on price was reached with the dissociating member within thirty days of her departure, which was not the case here. She contends she had the right to seek judicial valuation of her membership units after MPS breached the terms of the severance agreement. MPS believes it complied with the procedure and valuation method set out in section 2(j) of the severance agreement and the 2015 Operating Agreement.

We hold the circuit court erred in granting MPS's motion for summary judgment because the language of section 2(j) of Mattison's severance agreement is ambiguous as to the process that controls the valuation of Mattison's membership units. *See Middleborough Horizontal Prop. Regime Council of Co-Owners v. Montedison S.p.A.*, 320 S.C. 470, 477, 465 S.E.2d 765, 770 (Ct. App. 1995) ("The construction and enforcement of an unambiguous contract is a question of law for the court, and thus can be properly disposed of at summary judgment."); *cf. Gilliland v. Elmwood Properties*, 301 S.C. 295, 299-300, 391 S.E.2d 577, 579-80 (1990) (stating summary judgment is improper when the language of the contract is ambiguous); *HK New Plan Exch. Prop. Owner I, LLC v. Coker*, 375 S.C. 18, 23, 649 S.E.2d 181, 184 (Ct. App. 2007) ("Where a contract is unclear, or is ambiguous and capable of more than one construction, the parties' intentions are matters of fact to be submitted to a jury."). The circuit court found that the severance agreement was clear and unambiguous, a finding neither party expressly challenged on appeal. Nevertheless, the parties advocate for different readings of section 2(j) of the severance agreement, which controls the procedure for valuing Mattison's membership units. MPS asserts that section 2(j) of the severance agreement states the 2015 Operating Agreement controls the valuation of a properly dissociating member's units. It does not consider the language of section 2(j) stating the value of Mattison's membership units "shall be mutually determined" and that MPS will "provid[e] access to . . . financial information as requested by [Mattison's] [c]ounsel" to be significant. MPS contends the severance agreement allowed it to obtain a fair market value from HDH before making an offer to Mattison for her membership units. Mattison avers the "mutually determined" language means the parties must make a good faith effort to agree on the fair market value of the membership units after the disclosure of the financial information Mattison's counsel requested. She asserts the parties should have discussed and potentially decided on the value of her membership units before any formal valuation occurred. She further contends the 2015 Operating Agreement

does not control the valuation of her units because she never signed it. Although neither party expressly raised the argument on appeal, they fundamentally disagree about the application of the second sentence of section 2(j) as to the timing and process of valuation, the extent of negotiation and compromise required, and the amount and nature of the financial information MPS was required to provide Mattison. Thus, we find this issue is properly before us.

We hold that the language of section 2(j) of Mattison's severance agreement is ambiguous as to the proper method of valuation for her membership units. Section 2(j) states, "The parties agree that the value of [Mattison's] membership units shall be mutually determined in early 2018 following the close of YR2017, with [MPS] providing access to all current and prior year financial reports, tax returns, and other financial information as requested by [Mattison's] Counsel." This sentence supports Mattison's position that MPS violated the severance agreement by hiring HDH to perform a valuation of MPS before mutually determining the price of her membership units and providing her with MPS's financial information. However, section 2(j) also states "The Proper Dissociation will be handled separately from this Agreement and will be done in accordance with the September 30, 2015 Operating Agreement," which aligns with MPS's position that the proper method for valuation of Mattison's membership units was the one found in the 2015 Operating Agreement that allowed MPS's management committee to determine the price of the units annually. *See Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977) (stating an ambiguous contract is a contract capable of being understood in more than one way or a contract "unclear in meaning because it expresses its purpose in an indefinite manner"). Therefore, we hold the severance agreement's language regarding valuation of Mattison's membership units created an ambiguity, preventing summary judgment. *See Gilliland*, 301 S.C. at 299-300, 391 S.E.2d at 579-80 (stating granting summary judgment is improper when the language of the contract is ambiguous). Accordingly, we reverse the circuit court's order granting summary judgment in favor of MPS in the declaratory judgment action.

## II.     Discovery

Mattison argues MPS's motion for summary judgment was premature because she did not have sufficient opportunity to complete the discovery necessary to address the issues raised in the motion for summary judgment. She contends further discovery would likely uncover additional evidence relevant to the valuation of her membership units and the misinterpretation of the severance agreement by MPS. We agree.

We hold MPS's motion for summary judgment was premature because, as we stated, the language of the severance agreement is ambiguous as to proper method of valuation of Mattison's membership units. *See Coker*, 375 S.C. at 23, 649 S.E.2d at 184 ("Where a contract is unclear, or is ambiguous and capable of more than one construction, the parties' intentions are matters of fact to be submitted to a jury."); *ERIE Ins. Co. v. Winter Const. Co.*, 393 S.C. 455, 460, 713 S.E.2d 318, 320 (Ct. App. 2011) ("Basic contract law provides that when a contract is clear and unambiguous, the language alone determines the contract's force and effect."). Because we hold the language of the severance agreement is ambiguous as to whether Mattison's dissociation was to be handled under the 2015 Operating Agreement or based upon the parties' mutual valuation of the units, we hold the circuit court must consider extrinsic evidence when determining whether MPS's valuation of Mattison's membership units was proper. *See Guinan v. Tenet Healthsystems of Hilton Head, Inc.*, 383 S.C. 48, 54-55, 677 S.E.2d 32, 36 (Ct. App. 2009) ("A party claiming summary judgment is premature because they have not been provided a full and fair opportunity to conduct discovery must advance a good reason why the time was insufficient under the facts of the case, and why further discovery would uncover additional relevant evidence and create a genuine issue of material fact."); *Koontz v. Thomas*, 333 S.C. 702, 709, 511 S.E.2d 407, 411 (Ct. App. 1999) ("[I]f a contract is ambiguous, parol evidence is admissible to ascertain the true meaning and intent of the parties."). Therefore, we hold the circuit court erred in granting summary judgment to MPS when further discovery was necessary to determine the meaning of section 2(j) of the severance agreement.

### III.   Denial of Mattison's Motion to Stay

Mattison argues the circuit court erred in considering MPS's motion for summary judgment and declining her motion to stay proceedings. She contends "the issues surrounding the valuation of [her] ownership interests in MPS are inextricably intertwined with the issues raised in the earlier appeal of the derivative action." Mattison did not appeal the circuit court's order denying her motion to stay, and therefore we hold this court cannot consider whether the circuit court erred in refusing to stay proceedings pending the appeal of her derivative action. *See* Rule 203(d)(1)(B)(ii), SCACR ("The notice [of appeal] filed with the appellate court shall be accompanied by . . . [a] copy of the order(s) and judgment(s) to be challenged on appeal if they have been reduced to writing . . . .").

### IV.   Membership Units Discounts and Prejudgment Interest

Mattison argues that by accepting HDH's valuation of her membership units, the circuit court "approved arbitrary discounts of 10% for lack of control and 20% for lack of marketability." Mattison also contends the circuit court erred in refusing to award her prejudgment interest to compensate for MPS's use of her capital investment in MPS throughout the course of litigation when the value of her membership units was fixed at the time of her dissociation from MPS in February 2018. Because we reverse and remand the circuit court's grant of summary judgment as to the valuation of Mattison's membership units based on the language in the severance agreement, we decline to further consider the discounting of Mattison's membership units and her prejudgment interest claims. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not address the remaining issues when its determination of a prior issue is dispositive of those remaining issues).

 **CONCLUSION**

Based on the foregoing, the circuit court's order granting summary judgment to MPS is

**REVERSED AND REMANDED.**

**MCDONALD, J., and BROMELL HOLMES, A.J., concur.**